1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7

8

9   JERRY NEWMAKER, et al.,

10        Plaintiffs,                    No. C 12-4675 PJH

11   v.                                 **ORDER GRANTING DEFENDANTS'
                                         MOTION FOR SUMMARY JUDGMENT**
12   CITY OF FORTUNA, et al.,

13        Defendants.
    _____/

14

15        Defendants' motion for summary judgment based on qualified immunity came on for

16   hearing before this court on November 20, 2013.  Plaintiffs Jerry Newmaker and Susan

17   Olesen appeared by their counsel Dale K. Galipo, and defendants appeared by their

18   counsel Nancy K. Delaney and Nicholas Kloeppel.  Having read the parties' papers and

19   carefully considered their arguments and the relevant legal authority, the court hereby

20   GRANTS the motion.

21                              **BACKGROUND**

22        On the evening of March 15, 2012, Jacob Newmaker came to the Police Station in

23   Fortuna, California, to report that someone had chased him down an alley.  Although it had

24   been raining, Newmaker was barefoot.  Officer Soeth offered to take a report but

25   Newmaker declined.  Soeth testified in his deposition that Newmaker did not appear to be

26   injured but did appear to be under the influence of drugs or alcohol.  According to Soeth,

27   Newmaker asked for a ride home.  Soeth responded that the police could take a report, but

28   could not "facilitate a ride home," and that if Newmaker was not going to make a report, he

1    had to leave the lobby.

2          Officer Soeth next saw Newmaker at around 2:00 a.m. on the morning of March 16,

3    2012.  Newmaker was standing in the middle of the street with another person, who was on

4    a bicycle.  Soeth intended to make a traffic stop of the bicyclist, but Newmaker and the

5    bicyclist separated, the bicyclist walking his bike off in another direction.  Soeth decided to

6    focus his attention on Newmaker, whom he recognized as the person who had come into

7    the station earlier.

8          Soeth rolled down his window to talk to Newmaker.  He testified that Newmaker said

9    something about going to the hospital, and asked him to check on his (Newmaker's)

10   mother.  Soeth suspected that Newmaker was trying to get him to leave the area for some

11   reason.  He testified that Newmaker also again requested a ride home.  Soeth declined.

12   Soeth decided to follow Newmaker to make sure he did not access the property or vehicles

13   of others.

14         Newmaker had indicated that his mother lived on Newburg Road.  Officer Soeth

15   testified that as he followed Newmaker, Newmaker asked him to shine a light toward a

16   particular residence that Soeth understood to be the residence of Newmaker's mother.

17   Officer Soeth did so, and Newmaker entered the residence.  Officer Soeth continued on,

18   making a U-turn further down the road.  When he passed back by the house, he did not see

19   Newmaker.

20         Plaintiff Susan Olesen (Newmaker's mother) confirmed that Newmaker did appear at

21   her house at approximately 1:30 a.m.  She testified that he appeared "somewhat paranoid"

22   and also "scared."  (Officer Soeth also testified that Newmaker seemed to be somewhat

23   paranoid, based on some of the comments he was making.)

24         Ms. Olesen noted that Newmaker was speaking rapidly, pacing, and looking outside.

25   She suspected that he had been using drugs, but when she asked him, "[h]e said he wasn't

26   on drugs . . . ."  He indicated that law enforcement was "after him" and that officers were

27   going to arrest and kill him.  He also indicated that he believed law enforcement were under

28   the floor of the house.  Nevertheless, she was unable to persuade him to remain at her

United States District Court

For the Northern District of California

2

United States District Court

For the Northern District of California

1   residence.  She also confirmed that a light had been shined towards her residence, but

2   claimed that this occurred after Newmaker had already entered the house.

3   Back at the station, Officer Soeth received a call at around 6:00 a.m., reporting a

4   male subject in the Angel Heights area, who was banging on the doors and windows of an

5   occupied dwelling.  Officer Soeth was assigned as the primary officer on the call, and Sgt.

6   Charles Ellebrecht was assigned as backup.  The two officers departed from the station,

7   driving separate vehicles.

8   Sgt. Ellebrecht left the station shortly after Officer Soeth (or at approximately the

9   same time), and went to contact the party who had reported the disturbance in the Angel

10  Heights area.

11  Officer Soeth also initially proceeded towards the residence in Angel Heights.

12  Enroute, he saw Newmaker at the intersection of Eleventh and Vista Streets.  Newmaker

13  appeared to be wearing flip-flops, but no jacket.  (Soeth testified that Newmaker had earlier

14  appeared without shoes but with a jacket.)

15  Officer Soeth observed that Newmaker was on a bicycle and was proceeding south

16  on Vista, as was Soeth's police vehicle.  Soeth testified that he activated his lights to initiate

17  a stop because he had been informed that the individual that was the subject of the Angel

18  Heights dispatch had left that residence on a bicycle.

19  As Officer Soeth got out of his vehicle to contact Newmaker, Newmaker left on the

20  bicycle, proceeding south on Eleventh Street.  Accordingly, Soeth testified, he pursued the

21  bicycle in his car.  Soeth testified that Newmaker took off on the bicycle when he was

22  approximately 12 feet away; however, Newmaker abandoned the bicycle approximately a

23  block further on, at Tenth Street.  At that point, Soeth began calling out a pursuit.  Officer

24  Soeth did not see Newmaker with any weapons at that point, but did see Newmaker appear

25  to toss something.  A dashboard camera ("dash cam") on Soeth's vehicle made a video

26  recording of the encounter, up to the time Newmaker abandoned the bicycle.

27  Officer Soeth and Newmaker were on the east side of the street.  Soeth had parked

28  his patrol vehicle to the rear of a car that was to the south of the Mustang, nose into the

United States District Court

For the Northern District of California

1   curb.  Soeth testified that it appeared that Newmaker was headed toward the back yard,

2   and Soeth exited the patrol car and walked around a parked vehicle.  Newmaker then

3   reappeared, and Soeth ordered him to get down on the ground.  Newmaker did not comply.

4   Instead, Newmaker approached a parked vehicle, which Soeth recalled was a Mustang,

5   and "flopped" his torso on the hood of the vehicle.

6       Soeth had not requested that Newmaker lay on the hood of the Mustang, and Soeth

7   testified that this position put Newmaker between the two parked cars.  As Newmaker was

8   on the hood of the vehicle, Soeth could see Newmaker's arms only from the elbows up.

9   Soeth could not see Newmaker's hands, and was instructing him to show his hands.

10      Officer Soeth testified that he had learned that the reporting person had also

11  indicated that Newmaker claimed his skin was crawling from radiation.  This caused Soeth

12  to be concerned that Newmaker was under the influence of drugs and/or was mentally ill.

13      Officer Soeth moved Newmaker from the hood of the car to the ground, and

14  attempted to move Newmaker's arm from underneath him.  Soeth testified that they were

15  struggling in an area between two cars that were only a few feet apart.  He did not recall

16  the exact maneuver he used to take Newmaker to the ground, but he did grab Newmaker's

17  exposed elbow and twist it.  He told Newmaker to put his hands behind his back, but

18  Newmaker did not comply.

19      Officer Soeth drew his taser and removed the cartridge to use it in the drive stun

20  mode in an effort to gain compliance.  However, Newmaker grabbed the taser before the

21  cycle was complete.  Soeth testified that he pulled back because Newmaker was

22  attempting to grab the taser with his right hand as he was placing his left arm around

23  Soeth's legs.  As Soeth backed away, Newmaker attempted to flee.

24      Officer Soeth gave chase, ordering Newmaker to stop, and announcing himself as

25  the police.  At some point, Newmaker stopped on the sidewalk.  After stopping, Newmaker

26  assumed a "fighter's" stance, with a clinched fist and bent arm, and shouted something at

27  Soeth.  Soeth testified that it was apparent that Newmaker did not intend to comply, and

28  Soeth drew his taser, reinserted the cartridge, and ordered Newmaker to stop and get on

1   the ground.

2       Officer Soeth then fired the taser, and the probe made contact, causing Newmaker

3   to fall to the ground.  Soeth gave further orders for Newmaker to roll on his stomach, but

4   Newmaker did not comply.  Soeth then again activated the taser.  At this point, Newmaker

5   was in the gutter area between the sidewalk and a parked vehicle, angled toward the curb.

6   Soeth testified that after the taser cycle, Newmaker grabbed the wires and bit through

7   them, causing the wires to separate from the probe.

8       At this point, Officer Soeth realized that Sgt. Ellebrecht was approaching, as he

9   heard the siren and saw the lights.  Soeth had only the one cartridge, and could not

10  redeploy the taser.  As Ellebrecht approached, the dash cam on his vehicle began

11  recording the incident.  (As noted above, there was no recording from Soeth's dash cam

12  from the time Newmaker abandoned the bicycle.)  However, the street was narrow, and

13  had no street lights, and it was raining.

14      Officer Soeth testified that Newmaker was attempting to get up again, and so he

15  (Soeth) drew his baton and struck Newmaker in the elbow of the arm he was using to push

16  himself up with, to regain his footing.  Soeth described this as a one-handed strike that

17  successfully prevented Newmaker from regaining his footing at that point.

18      Officer Soeth testified that Sgt. Ellebrecht suggested that they attempt to go "hands

19  on" to get Newmaker in handcuffs.  Because Soeth was unable to collapse his baton, he

20  tossed it to the edge of the sidewalk out of the immediate area.  Soeth then grabbed

21  Newmaker's left hand, and Ellebrecht successfully applied a handcuff to Newmaker's right

22  hand.

23      The officers maneuvered Newmaker from the curb area to the middle of the street,

24  but according to Officer Soeth, were unable to control Newmaker's hands to allow his left

25  hand to be cuffed behind his back.  Soeth testified that he was struggling with Newmaker's

26  left hand, above Newmaker's head.

27      Officer Soeth testified that he and Sgt. Ellebrecht were able to maneuver Newmaker

28  on his feet or knees to a position in the street, moving him approximately six feet.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  Newmaker then placed his left hand on the ground, and Soeth testified he retrieved his

2  baton so he could use it as a lever to move Newmaker's left hand.

3      At this point, according to Soeth, Sgt. Ellebrecht still had Newmaker's right hand,

4  and the officers' goal was to join both Newmaker's hands so they could complete the

5  cuffing behind Newmaker's back.  Soeth intended to then investigate the original call and

6  arrest Newmaker for resisting.

7      Officer Soeth testified that as he put the baton in position, Newmaker jerked his right

8  hand away from Sgt. Ellebrecht, and grabbed the baton with both hands.  Newmaker was

9  turned towards Soeth, and Ellebrecht suggested using pepper spray.  Soeth testified that

10  he stated that Newmaker was getting his baton, in order to communicate to Ellebrecht that

11  he (Soeth) did not have a free hand to access his pepper spray.

12      Sgt. Ellebrecht attempted to spray Newmaker in the face with pepper spray, and

13  Officer Soeth stated that Newmaker had taken the baton.  Ellebrecht testified that

14  Newmaker had the baton at some point, but he could not recall if Newmaker had the baton

15  at the exact moment Ellebrecht pepper-sprayed him.  Ellebrecht did not draw his firearm.

16  He claimed to have been affected by the overspray of the pepper spray.

17      According to Officer Soeth, Newmaker immediately got up after obtaining the baton,

18  and began swinging it.  Soeth backed up to avoid Newmaker's swings with the baton.

19  Soeth testified that he drew his firearm, and told Newmaker to drop the baton.  At that

20  point, Newmaker turned towards Sgt. Ellebrecht, swinging the baton "violently . . . at about

21  head height."  As Newmaker stepped towards Ellebrecht, Soeth fired one shot.

22      As discussed below, one of the main disputes between the parties is whether

23  Newmaker had the baton in his hands and whether he was swinging it at Sgt. Ellebrecht –

24  that is, whether it was objectively reasonable for Soeth to fire his weapon at Newmaker.

25  The "enhanced" video from the dash cam in Ellebrecht's car does not show the baton in

26  Newmaker's hands, but Soeth claims that the video lost detail when it was "enhanced" by

27  plaintiff's video expert.  Both Soeth and Ellebrecht testified that Newmaker was swinging

28  the baton at Ellebrecht just prior to the shot by Soeth.

United States District Court

For the Northern District of California

1   Officer Soeth testified that Newmaker appeared to go to his knees as he swung the

2   baton towards Ellebrecht, but he then appeared to be rising again.  At that point, Soeth

3   fired a second shot.  A nearby resident – Carol Harris – who had been awakened by the

4   sirens and the sounds of the struggle, confirmed seeing two muzzle flashes from Soeth's

5   gun, approximately two seconds apart.  Ms. Harris also confirmed that she heard yelling,

6   and heard the officer who fired the gun say, "Put the weapon down, put the weapon down"

7   before the shots were fired.

8   Officer Soeth testified that he observed Sgt. Ellebrecht attempting to back away from

9   Newmaker when the two shots were fired.  Soeth did not know whether he had struck

10   Newmaker with the first shot, as he was uncertain whether Newmaker had gone to the

11   ground as a result of that shot or because he (Newmaker) was swinging the baton so

12   violently that he fell forward from the motion.  Soeth observed Newmaker continue to swing

13   the baton after the first shot, as he was getting back up from the ground.

14   Officer Soeth testified that after the second shot was fired, Newmaker went to the

15   ground on his knees, bent forward, with the baton still in his right hand.  His resistance

16   ceased at that point, however, and the officers ordered him to drop the baton.  As the

17   officers approached Newmaker, Sgt. Ellebrecht grabbed his right hand, kicked the baton

18   away, and concluded handcuffing him.

19   Plaintiffs claim that the video does not show Newmaker holding the baton, and that

20   Soeth simply shot Newmaker twice in the back.  However, plaintiffs assert, even if

21   Newmaker did have the baton and did swing it at Ellebrecht's head after Soeth fired the first

22   shot, he was on the ground after the first shot and Soeth thus had no reason to fire the

23   second shot.

24   The officers initiated CPR, and called an ambulance.  The medical examiner

25   concluded, based on autopsy findings, that Newmaker had consumed methamphetamine.

26   The main issue that is disputed in the case is whether the officer's use of deadly

27   force was reasonable under the circumstances – whether Newmaker was posing a serious

28   threat to the officer and/or to the second officer on the scene.

United States District Court

For the Northern District of California

1    Plaintiffs filed this action on September 6, 2012, against the City of Fortuna ("the

2   City") and 10 "Doe" defendants.  Plaintiffs later substituted in Officer Soeth and Sgt.

3   Ellebrecht for two of the "Does."  In the complaint, plaintiffs assert seven cause of action –

4   (1) a Fourth Amendment claim of unreasonable search and seizure (detention and arrest)

5   under 42 U.S.C. § 1983 (against Soeth and Ellebrecht); (2) a Fourth Amendment claim of

6   unreasonable search and seizure (excessive force and denial of medical care), under

7   § 1983 (against Soeth and Ellebrecht); (3) a Fourteenth Amendment claim of violation of

8   substantive due process, under § 1983 (against Soeth and Ellebrecht); (4) municipal

9   liability for unconstitutional custom, practice, or policy, under § 1983 (against the Police and

10   City supervisorial employees identified only as "Does," and the City); (5) false arrest/false

11   imprisonment (against Soeth and Ellebrecht, and the City through California Government

12   Code § 820); (6) battery (wrongful death) (against Soeth and Ellebrecht, and the City

13   through Government Code § 820); and (7) negligence (against Soeth and Ellebrecht, and

14   the City through Government Code § 820).

**DISCUSSION**

16   A.    Legal Standards

17         1.    Motions for summary judgment

18         A party may move for summary judgment on a "claim or defense" or "part of . . . a

19   claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

20   no genuine dispute as to any material fact and the moving party is entitled to judgment as a

21   matter of law.  Id.

22         A party seeking summary judgment bears the initial burden of informing the court of

23   the basis for its motion, and of identifying those portions of the pleadings and discovery

24   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

25   v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

26   of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

27   material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

28   verdict for the nonmoving party.  Id.

8

United States District Court

For the Northern District of California

1    Where the moving party will have the burden of proof at trial, it must affirmatively

2    demonstrate that no reasonable trier of fact could find other than for the moving party.

3    Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

4    the nonmoving party will bear the burden of proof at trial, the moving party can prevail

5    merely by pointing out to the district court that there is an absence of evidence to support

6    the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the moving party meets its

7    initial burden, the opposing party must then set out specific facts showing a genuine issue

8    for trial in order to defeat the motion.  Anderson, 477 U.S. at 250; see also Fed. R. Civ. P.

9    56(c), (e).

10    When deciding a summary judgment motion, a court must view the evidence in the

11    light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

12    Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

13        2.    Qualified immunity

14    In federal court, the defense of qualified immunity protects "government officials

15    . . . from liability for civil damages insofar as their conduct does not violate clearly

16    established statutory or constitutional rights of which a reasonable person would have

17    known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The rule of qualified immunity

18    protects "all but the plainly incompetent or those who knowingly violate the law;" defendants

19    can have a reasonable, but mistaken, belief about the facts or about what the law requires

20    in any given situation.  Saucier v. Katz, 533 U.S. 194, 202 (2001) (quotation and citation

21    omitted).  "Therefore, regardless of whether the constitutional violation occurred, the

22    [official] should prevail if the right asserted by the plaintiff was not 'clearly established' or

23    the [official] could have reasonably believed that his particular conduct was lawful."

24    Romero v. Kitsap County, 931 F.2d 624, 627 (9th Cir. 1991).

25    A court considering a claim of qualified immunity must determine whether the

26    plaintiff has alleged the deprivation of an actual constitutional right and whether such right

27    was clearly established such that it would be clear to a reasonable officer that his conduct

28    was unlawful in the situation he confronted.  Pearson v. Callahan, 555 U.S. 223, 236 (2009)

United States District Court

For the Northern District of California

1   (overruling the sequence of the two-part test that required determination of a deprivation

2   first and then whether such right was clearly established, as required by <u>Saucier</u>).  The

3   court may exercise its discretion in deciding which prong to address first, in light of the

4   particular circumstances of each case.  <u>Id.</u>

5          Regarding the first prong, the threshold question must be:  Taken in the light most

6   favorable to the party asserting the injury, do the facts alleged show the officer's conduct

7   violated a constitutional right?  <u>Saucier</u>, 533 U.S. at 201; <u>see</u> <u>Martin v. City of Oceanside</u>,

8   360 F.3d 1078, 1082 (9th Cir. 2004) (in performing the initial inquiry, court is obligated to

9   accept plaintiff's facts as alleged, but not necessarily his application of law to the facts; the

10  issue is not whether a claim is stated for a violation of plaintiff's constitutional rights, but

11  rather whether the defendants actually violated a constitutional right).  "If no constitutional

12  right would have been violated were the allegations established, there is no necessity for

13  further inquiries concerning qualified immunity."  <u>Saucier</u>, 533 U.S. at 201.

14         The relevant, dispositive inquiry in determining whether a right is clearly established

15  is whether it would be clear to a reasonable officer that his conduct was unlawful in the

16  situation he confronted.  <u>Id.</u> at 202; <u>Pearson</u>, 555 U.S. at 243-45.  If the law did not put the

17  officer on notice that his conduct would be clearly unlawful, summary judgment based on

18  qualified immunity is appropriate.  <u>Saucier</u>, 533 U.S. at 202.  Whether qualified immunity

19  applies "turns on the objective legal reasonableness of the action, assessed in light of the

20  legal rules that were clearly established at the time it was taken."  <u>Chappell v. Mandeville</u>,

21  706 F.3d 1052, 1056 (9th Cir. 2013) (citing <u>Messerschmidt v. Millender</u>, 132 S.Ct. 1235,

22  1245 (2012)).

23  B.     Defendants' Motion

24         Officer Soeth, Sgt. Ellebrecht, and the City moved for summary judgment as to all

25  claims asserted against them.  Defendants argue that the officers are entitled to qualified

26  immunity, as they did not violate any clearly established constitutional right; and that the

27  court should decline to exercise jurisdiction over the remaining state law claims, or should

28  find that the fact that the officers' conduct was objectively reasonable precludes those state

1   law claims as a matter of law.

2       Plaintiffs do not oppose dismissal of their claims against Sgt. Ellebrecht, and also do

3   not oppose dismissal of their claims for unreasonable detention, false arrest, denial of

4   medical care, and <u>Monell</u> liability.  Their primary position is that disputed issues of fact with

5   regard to whether Officer Soeth used excessive force preclude summary judgment as to

6   the remaining claims, and also preclude a finding of qualified immunity.

7       Accordingly, Sgt. Ellebrecht is dismissed from the case.  In addition, because

8   plaintiffs do not oppose summary judgment as to the § 1983 claim of unreasonable

9   detention and false arrest against Soeth (first cause of action); the state law claim of false

10  arrest/false imprisonment against Soeth (fifth cause of action); and the § 1983 claim for

11  denial of medical care against Soeth (part of second cause of action), those claims are

12  dismissed.  Because plaintiffs do not oppose summary judgment as to the § 1983 claim

13  against the City of Fortuna (fourth cause of action), the constitutional claims asserted

14  against the City are dismissed.

15      The three state law claims (false arrest/false imprisonment, battery/wrongful death,

16  and negligence) are also alleged against the City (as well as Officer Soeth), and plaintiffs

17  have indicated that they intend to proceed with the state law claims of battery/wrongful

18  death and negligence against Soeth, as well as claims of vicarious liability for those two

19  causes of action against the City.

20      What remains in the case as to Officer Soeth are the § 1983 claims under the Fourth

21  and Fourteenth Amendments (portion of the second cause of action for excessive force,

22  and the entirety of third cause of action for violation of substantive due process), plus the

23  state law claims for  battery and negligence.  In addition, as noted above, the state law

24  claims of battery and negligence are at issue with regard to the City.

25      Defendants argue that Soeth is entitled to qualified immunity because plaintiffs

26  cannot show a violation of any clearly established constitutional right, as to either the

27  Fourth Amendment excessive force claims or to the Fourteenth Amendment substantive

28  due process (familial association) claim.

**United States District Court**
For the Northern District of California

1          1.      The parties' arguments

2                  a.      Fourth Amendment excessive force claim

3          Claims that law enforcement used excessive force are evaluated under the Fourth

4   Amendment and its "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395

5   (1989); Tennessee v. Garner, 471 U.S. 1, 7 (1985).  While the use of "force" is reasonable

6   under the Fourth Amendment if it would seem justified to a reasonable officer in light of the

7   surrounding circumstances, the use of "deadly force" is justified only where the officer "has

8   probable cause to believe that the suspect poses a significant threat of death or serious

9   physical injury to the officer or others.  Garner, 471 U.S. at 3; see also Gonzalez v.

10  Anaheim, 715 F.3d 766, 772 (9th Cir. 2013) (use of deadly force objectively reasonable

11  where events occurred so quickly that absolute certainty of harm to officer not required).

12         Under this test, an officer is justified in using deadly force where a suspect threatens

13  him with a weapon such as a gun or a knife.  See, e.g., Billington v. Smith, 292 F.3d 1177,

14  1185 (9th Cir. 2002) (deadly force justified where suspect violently resisted arrest,

15  physically attacked the officer, and grabbed the officer's gun); Reynolds v. County of San

16  Diego, 84 F.3d 1162, 1168 (9th Cir. 1996) (deadly force reasonable where suspect, who

17  had been behaving erratically, swung a knife at the officer).  In Price v. Sery, 513 F.3d 962

18  (9th Cir. 2008), the Ninth Circuit reviewed case law applicable to the use of deadly force

19  and concluded that it "requires that a reasonable officer under the circumstances believe

20  [himself] or others to face a threat of serious physical harm before using deadly force."  Id.

21  at 971.  The touchstone of the inquiry is "reasonableness," which does not admit of an

22  "easy-to-apply legal test."  Id.

23         In determining whether deadly force was necessary, the court inquires whether a

24  reasonable, non-deadly alternative existed for apprehending the suspect, judged from the

25  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

26  hindsight.  Forrett v. Richardson, 112 F.3d 416, 420 (9th Cir. 1997).  In judging

27  reasonableness, the court must allow "for the fact that [peace] officers are often forced to

28  make split-second judgments – in circumstances that are tense, uncertain, and rapidly-

United States District Court
For the Northern District of California

1   evolving – about the amount of force that is necessary in a particular situation."  Graham,

2   490 U.S. at 396. (citation and quotation omitted).

3       Here, defendants argue, it is undisputed that Officer Soeth first attempted to use

4   non-deadly alternatives.  When Soeth – who was investigating a report of a prowler – first

5   got out of his vehicle to approach Newmaker, Newmaker fled on the bicycle.  Soeth

6   returned to his vehicle, and pursued Newmaker, who abandoned the bicycle and took off

7   on foot, apparently headed towards the back yard of a residence.

8       Newmaker then turned back and ran towards a parked car.  Officer Soeth ordered

9   Newmaker to get down on the ground, but Newmaker refused that order and instead lay

10  down on the hood of the parked car, with his arms and hands underneath him.  Because

11  Soeth had been unable to see Newmaker's hands, and still could not see them (or the

12  lower part of his arms), he again told Newmaker to get on the ground.  When Newmaker

13  failed to comply, Soeth grabbed Newmaker's right arm and forced him from the hood of the

14  car, onto the ground.

15      Defendants claim that under these circumstances, Soeth acted reasonably in using

16  a takedown move on Newmaker, as it was of critical importance that he be able to see

17  Newmaker's hands, to ensure his own safety.  For the same reason, defendants argue, it

18  was objectively reasonable for Soeth to use his taser in drive stun mode when Newmaker

19  refused to obey Soeth's lawful order to put his hands behind his back and to stop resisting

20  after he was taken down.

21      As the struggle ensued, Newmaker grabbed Officer Soeth's leg, and then escaped

22  by fleeing, but then turned and displayed a "fighting stance" as Soeth approached him.

23  Defendants assert that under these circumstances, Soeth was justified in using his taser in

24  probe mode to attempt to gain compliance from Newmaker.  As Newmaker continued to

25  disobey commands, Soeth deployed an additional taser cycle.  However, Newmaker

26  grabbed the electrical leads, placed them in his mouth, and bit them apart.

27      Officer Soeth continued to attempt to gain Newmaker's compliance with commands

28  to remain on the ground, but Newmaker responded by grabbing at Soeth.  In addition to the

United States District Court

For the Northern District of California

1   problems Soeth was having with controlling Newmaker, he still had no knowledge of

2   whether Newmaker was armed.  Accordingly, defendants assert, given that the prior use of

3   force was not sufficient to effectuate the arrest, Soeth was justified in using the baton on

4   Newmaker's arm at the point at which Newmaker was attempting to get up from the

5   ground.

6        Officer Soeth testified that he dropped his baton so he could help Sgt. Ellebrecht

7   handcuff Newmaker, but Newmaker continued to struggle, making it impossible to cuff him.

8   Soeth again took hold of his baton, but that Newmaker again broke free, this time grabbing

9   onto the baton with both hands.  Ellebrecht attempted to subdue Newmaker with pepper

10  spray, but it appeared to have little effect.  It was after this that Newmaker swung the baton

11  at Ellebrecht.

12       Defendants argue that under these circumstances, the use of force was reasonable

13  because the circumstances confronting Soeth were "tense, uncertain, and rapidly evolving"

14  – Newmaker had engaged in multiple assaults on the officers through his active resistance,

15  culminating in the use of a deadly weapon against Sgt. Ellebrecht.  Thus, defendants

16  assert, there can be no dispute that a reasonable officer in Soeth's circumstances would

17  believe that Ellebrecht faced a threat of serious physical harm.  They argue that since a

18  reasonable fact-finder must conclude that the force used, including the shooting, was not

19  the result of plain incompetence or knowing violation of the law, Officer Soeth is entitled to

20  qualified immunity.

21       Defendants also provide a response to what they anticipate will be plaintiffs'

22  argument that qualified immunity is unavailable because the officers should have used a

23  lesser degree of force after Newmaker fell to the ground.  They contend that it is irrelevant

24  whether Newmaker was standing, falling to the ground, or attempting to get up – the fact is

25  that Soeth fired two shots in rapid succession in response to Newmaker's swinging the

26  baton at the head of Sgt. Ellebrecht.  At the time the shots were fired, Newmaker was in

27  possession of a deadly weapon which he was attempting to use on Ellebrecht.

28       In opposition, plaintiffs argue that there are disputed issues of material fact that

14

United States District Court

For the Northern District of California

1   preclude summary judgment as to the § 1983 claims; that Officer Soeth's use of deadly

2   force was excessive and unreasonable; and that Soeth is not entitled to qualified immunity,

3   or in the alternative, Soeth is liable under § 1983 because his pre-shooting unreasonable

4   force provoked the shooting.

5       First, plaintiffs contend that there are disputed issues of material fact that preclude

6   summary judgment as to the § 1983 claims.  With their opposition, plaintiffs filed a

7   declaration attaching as exhibits a copy of the autopsy report; copies of the video recording

8   of Officer Soeth's dash cam and the video recording of Sgt. Ellebrecht's dash cam (both in

9   DVD-R format); a copy of Sgt. Ellebrecht's dash cam video, which was "enhanced" by

10  plaintiffs' retained expert Doug Carner (in DVD-R format); a copy of the audio recording of

11  an interview of witness Carol Harris by police investigators; copies of the Declaration of

12  Roger Clark (plaintiffs' police practices expert) and the Declaration of Dr. Roger O'Halloran

13  (plaintiffs' forensic pathology expert); a copy of a photo of the baton at the scene of the

14  incident; copies of pages of the transcription of the March 17, 2013 recorded first interview

15  with Officer Soeth, the April 4, 2013 second interview with Officer Soeth, the March 17,

16  2013 first interview with Sgt. Ellebrecht, and the April 19, 2013 second interview with Sgt.

17  Ellebrecht; and copies of pages of the transcription of the deposition of Officer Soeth and

18  the deposition of Sgt. Ellebrecht.

19      Much of plaintiffs' opposition is premised on the opinions of Mr. Clark and Dr.

20  O'Halloran, as to their view of the sequence of events, based on the "enhanced" dash cam

21  videos, the autopsy report, and the interviews and depositions of the two officers.  Mr. Clark

22  opines that Officer Soeth's use of the taser and baton was unreasonable, and that his use

23  of deadly force was unreasonable; and Dr. O'Halloran attempts to correlate the autopsy

24  findings with what is depicted in the versions of the dash cam videos that he was provided.

25      Based on these opinions, plaintiffs argue that it is disputed whether Newmaker ever

26  touched the baton, since the video recording of the shooting does not show Newmaker with

27  anything in his hands, and the recording that was "enhanced" by plaintiffs' expert reveals

28  that Newmaker never had anything in his hands.

1   Plaintiffs assert further that it is disputed whether Newmaker was standing (as

2   opposed to kneeling on the ground facing away from both officers) when he was shot,

3   because the officers initially told investigators that Newmaker was shot twice while swinging

4   the baton, and then fell to the ground, but later stated in interviews and depositions that the

5   first shot happened while Newmaker was standing and the second while he was on the

6   ground.  Moreover, they argue, the video shows that Newmaker fell to the ground before

7   either shot was fired, and the bullet trajectory described in the autopsy report indicates that

8   he was kneeling on the ground when he was shot.

9   Finally, plaintiffs contend that it is disputed whether Newmaker swung the baton

10   after he went to the ground, because the video recording does not show that he had

11   anything in his hands, including after he fell to the ground.

12   In their second main argument, plaintiffs assert that Officer Soeth's use of deadly

13   force was excessive and unreasonable.  Citing their police practices expert, Mr. Clark,

14   plaintiffs contend that California P.O.S.T. trains officers that deadly force is to be used as a

15   last resort, and to justify the use of deadly force there must be a reasonable and immediate

16   threat to life, and also a warning must be given.

17   Here, plaintiffs argue, no warning was given, and the deadly force used was

18   unreasonable because Newmaker was exhibiting signs of mental illness; because he was

19   not suspected of having committed any serious crime; because he "attempted to comply"

20   by placing his body on the hood of a car, but Officer Soeth suddenly tackled him to the

21   ground without warning; and because he fell to the ground in a kneeling position after

22   multiple taser strikes and baton strikes, and the application of pepper spray.  Plaintiffs

23   again assert that because the video shows no baton (or other weapon) in Newmaker's

24   hand, and does not show him swinging anything at anyone, he clearly was not a threat to

25   either officer as he was kneeling on the ground facing away from them.

26   b.   Fourteenth Amendment familial association claim

27   The Due Process Clause of the Fourteenth Amendment protects individuals against

28   governmental deprivations of "life, liberty or property," as those words have been

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  interpreted and given meaning over the life of our republic, without due process of law.

2  Board of Regents v. Roth, 408 U.S. 564, 570-71 (1972); Mullins v. Oregon, 57 F.3d 789,

3  795 (9th Cir. 1995).  The Due Process Clause confers both procedural and substantive

4  rights.  See Armendariz v. Penman, 75 F.3d 1311, 1318 (9th Cir. 1996) (en banc).

5  Substantive due process refers to certain actions that the government may not engage in,

6  no matter how many procedural safeguards it employs.  County of Sacramento v. Lewis,

7  523 U.S. 833, 847 (1998); Blaylock v. Schwinden, 862 F.2d 1352, 1354 (9th Cir. 1988).

8        Due process protection in the substantive sense limits what the government may do

9  in both its legislative and executive capacities.  See Lewis, 523 U.S. at 846. "Only official

10  conduct that 'shocks the conscience' is cognizable as a due process violation." Porter v.

11  Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting Lewis, 523 U.S. at 846).  Such

12  conduct may include a State's interference with personal decisions relating to marriage,

13  procreation, contraception, family relationships, child rearing, and education, as well as with

14  an individual's bodily integrity.  Armendariz, 75 F.3d at 1319.

15        "The substantive due process right to family integrity or to familial association is well

16  established."  Rosenbaum v. Washoe County, 663 F.3d 1071, 1079 (9th Cir. 2011).  "A

17  parent has a fundamental liberty interest in companionship with his or her child." United

18  States v. Wolf Child, 699 F.3d 1082, 1091 (9th Cir. 2012) (citation and quotation omitted).

19  Likewise, a child has a fundamental liberty interest in the companionship and society of his

20  or her parent.  Lee v. City of L.A., 250 F.3d 668, 685-86 (9th Cir. 2001).

21        Parents and children may assert Fourteenth Amendment substantive due process

22  claims if they are deprived of their liberty interest in the companionship and society of their

23  child or parent through official conduct.  Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir.

24  2010) (citing Curnow ex rel. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir.

25  1991)); see also Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 371 (9th Cir.

26  1998).  "[O]nly official conduct that 'shocks the conscience' is cognizable as a due process

27  violation."  Porter, 546 F.3d at 1137 (quoting Lewis, 523 U.S. at 846); see also Marsh v.

28  County of San Diego, 680 F.3d 1148, 1154 (9th Cir. 2012) (quotation and citation omitted).

1    Here, defendants argue, because the use of force by the officers was reasonable,

2  and qualified immunity applies, the substantive due process claim of violation of familial

3  association rights is also barred by qualified immunity.

4    In response, plaintiffs contend that there are disputed issues with regard to the

5  familial association substantive due process claim.  They make arguments similar to those

6  they made in connection with the Fourth Amendment excessive force claim, except that

7  they also assert that the actions of Officer Soeth "shock the conscience" and reflect

8  deliberate indifference sufficient to support a claim of violation of substantive due process.

9  Plaintiffs also assert that Officer Soeth is not entitled to qualified immunity, for the reasons

10  argued above with regard to the Fourth Amendment excessive force claim.

11    2.    Analysis

12    Summary judgment is GRANTED as to the § 1983 claims asserted against Officer

13  Soeth, based on qualified immunity, because plaintiffs have not clearly established the

14  deprivation of an actual constitutional right.  See Pearson, 555 U.S. at 236.

15    The basic issue raised by the parties is whether Officer Soeth's use of deadly force

16  was reasonable under the circumstances, which under the  facts of this case involves a

17  consideration of whether Newmaker had the baton in his possession, and whether he

18  swung the baton at either of the officers.  The court finds that defendants' evidence

19  supports a finding that Newmaker both had the baton and attempted to swing it at Sgt.

20  Ellebrecht.  By contrast, the evidence and speculative inferences presented by plaintiffs in

21  opposition to defendants' motion do not create any disputed facts.

22    The "enhanced" dash cam video evidence presented by plaintiffs is inadmissible

23  because it does not accurately represent what happened at the scene.  The court has

24  viewed the version of the video provided by defendants, as well as the version provided by

25  plaintiffs, and finds in general that the images on both versions of the video are murky and

26  unclear, as the incident occurred at night, in low light conditions, while it was raining.

27    Moreover, as noted above, there is no video recording of the portion of the

28  encounter from the time Newmaker abandoned the bicycle until Sgt. Ellebrecht arrived on

the scene.  As well, a major portion of the encounter between Newmaker and the two

officers is not visible on the video because it occurred behind a car that was parked in front

of and facing Ellebrecht's car (where the dash cam was recording).

Even more problematic, plaintiffs have provided neither a declaration from their

video expert, nor a copy of the expert report.  Plaintiffs' only reference to the

"enhancement" in their opposition brief is the statement that "[p]laintiffs retained a video

expert and had Ellebrecht's dash cam video enhanced."  Opp. at 3.  Plaintiffs' counsel's

declaration attaches a copy of "the videorecording or Sergeant Ellebrecht's dash [c]am

which has been enhanced by [p]laintiffs' retained expert Doug Carner," but explains only

that "[s]aid videorecording was enhanced using the videorecording of Ellebrecht's dash

cam that was produced by [d]efendants during discovery."  Declaration of Dale K. Gallipo,

¶ 5.  However, plaintiffs have provided no explanation of what was done to the video, and

no foundation for such analysis, even had any been provided.

What is clear, based on the declaration of defendants' video expert Michael Schott,

is that the versions of the videos provided to plaintiffs' experts, including the "enhanced"

versions prepared by Mr. Carner, were not the first generation download of the dash cam,

and that the video files provided to plaintiffs' experts were the result of "amateur

transcoding (and concomitant data loss)," which resulted in some distortion of the image

and elimination of some video frames.  Thus, the versions provided to plaintiffs' experts do

not provide a technically accurate representation of the incident.

Moreover, as Mr. Schott explains, even the first generation of the video provides a

distorted version of the incident, as the format in which it is stored (MPEG) inherently

eliminates information through compression, such that images are distorted and either

contain objects that were not present or remove objects that were present ("video

compression artifacts").  For this reason, expert forensic analysis is required to interpret

videos and images stored in MPEG format.

The court finds that the opinions offered by plaintiffs' experts Mr. Clark and Dr.

O'Halloran, which plaintiffs claim create a triable issue of fact, must be excluded under

19

Federal Rule of Evidence 702, as neither has any expertise, training, or experience in forensic video analysis, or is qualified to identify what images are captured by the video, or to evaluate the deficiencies in the video quality, including "video compression artifacts" or missing frames or loss of imaging from the edge of the video due to the enhancements by plaintiffs' video expert.

Neither Mr. Clark nor Dr. O'Halloran relied on matters that were reasonable in formulating their opinions, as it appears that they simply relied on the video provided them by plaintiffs' counsel and as "enhanced" by the video expert. However, as explained by Mr. Schott, the versions of the video viewed by Mr. Clark and Dr. O'Halloran are not suitable for forensic analysis because they have loss of detail, material data, and entire frames. For example, Mr. Schott conducted a frame-by-frame comparison between the images in the video "enhanced" by Mr. Carner, and the images he (Mr. Schott) obtained from the first generation download of the video, and found that Mr. Carner's version was missing frames at the rate of 1 for every 33.3 seconds of video; and that in addition, critical data was cropped or removed from the right-hand edges of the images in Mr. Carner's version. See Schott Decl. ¶¶ 4-5. and Exh. B thereto.

The opinions of plaintiffs' experts are also unreliable because they are speculative. For example, Mr. Clark infers that Newmaker never touched the baton because his DNA and fingerprints were not found on it, but offers no foundation for this opinion, such as evidence that the baton was tested for DNA or evidence as to the likelihood that fingerprints would have been recoverable from the baton given the rainy conditions. Moreover, he is not an expert in this type of analysis. Mr. Clark's opinion that Officer Soeth's baton strikes were unreasonable based on his view of the video is also speculative, because the video does not depict Newmaker's active resistance in struggling with Soeth prior to Sgt. Ellebrecht's arrival on the scene.

As for Dr. O'Halloran, his opinion that Newmaker fell to the ground before he was shot is entirely speculative. He states that Newmaker could have been shot if he was leaning forward sharply at the time, which is consistent with shots being fired as Newmaker

United States District Court

For the Northern District of California

1    swung the baton at Sgt. Ellebrecht's head, but missed, and then attempted to get up to

2    continue his assault on Ellebrecht.

3        In contrast, Mr. Schott begins his analysis with the image itself, rather than relying

4    on external information to interpret the image.  Moreover, Mr. Schott never assumes (as

5    plaintiffs' experts apparently have) that the video is an accurate depiction of the event.  The

6    methodology employed by plaintiffs' experts is plainly inadequate for evaluating the content

7    of a video of this nature.

8        With regard to the question whether Newmaker had the baton in his hand, the court

9    finds no triable issue.  As noted above, plaintiffs' experts – who were not themselves

10   witnesses to the incident – are relying on the doctored videotape to conclude that

11   Newmaker did not have the baton.  However, the two officers have testified that they both

12   saw Newmaker with the baton in his hand, and Ms. Harris has testified that immediately

13   before she heard the shots, she heard Officer Soeth tell Newmaker to "put the weapon

14   down."  Thus, there is no evidence in the record to dispute defendants' claim that

15   Newmaker had the baton in his hand.

16       With regard to the question whether the baton was in Newmaker's possession in

17   such a way that he could have used it as a weapon, it  was reasonable for Officer Soeth to

18   conclude that Newmaker might use the baton in a dangerous way against Ellebrecht,

19   merely by virtue of having it in his possession, particularly in light of Ms. Harris' testimony

20   that Newmaker's resistance was violent.  It appears from the video provided by the

21   defendants and the still frame (17:43) provided as part of Exhibit B to Mr. Schott's

22   declaration that Newmaker had the baton in his hand as he was moving in a downward

23   direction.  At a minimum, he was not prone.  The court finds no evidence sufficient to create

24   a triable issue.

25       Plaintiffs contend that the officers should have considered "alternatives" before

26   resorting to deadly force.  However, the degree to which alternatives can be considered

27   depends on whether the offender posed an immediate threat to the safety of anyone as the

28   force was applied.  See Graham, 490 U.S. at 396; Forrett, 112 F.3d at 420.  For example,

United States District Court

For the Northern District of California

1    where a suspect is armed, but then discards the weapon and does not continue to resist

2    arrest, the officers clearly have an alternative to the use of deadly force.

3         Here, however, Newmaker refused to comply with commands to get on the ground

4    and show his hands, actively resisted the officers when they attempt to detain him,

5    attempted to flee from the officers, assaulted the officers at multiple points during the

6    encounter, and grabbed a baton (a deadly weapon) out of Officer Soeth's hands.

7    Nevertheless, Soeth did not use deadly force until Newmaker swung at Sgt. Ellebrecht with

8    a deadly weapon.

9         Plaintiffs argue that the force used was excessive because Officer Soeth failed to

10   employ the alternative of warning Newmaker that he was about to use a firearm.  The court

11   finds, however, that this assertion is contradicted by the evidence.  Ms. Harris, the witness,

12   testified that she heard the officer who fired the gun (Soeth) say, "Put the weapon down!" at

13   least three times before he fired the gun.  While Soeth may not literally have said, "Put the

14   weapon down, or I'll shoot," the order "Put the weapon down!" was clearly intended as a

15   warning to Newmaker, particularly in view of the fact that Soeth had at that point drawn his

16   firearm.  Moreover, under the circumstances as described above, and given that Newmaker

17   was actively engaged in a deadly assault against Sgt. Ellebrecht, it was not feasible for

18   Soeth to provide any other warning.

19        Where a police officer's conduct is reasonable but nonetheless provokes a violent

20   response, the officer cannot be held liable for any consequences of that "provocation"

21   regardless of his subjective intent or motive.  Billington v. Smith, 292 F.3d 1177, 1190 (9th

22   Cir. 2002).  Here, the evidence shows that any pre-shooting force used by Officer Soeth

23   was reasonable based on the circumstances presented to him at the time the force was

24   used.

25        Finally, the court discerns only two material issues that are potentially disputed.

26   First, plaintiff argues that the discrepancy between the officers' statements in their initial

27   interviews (that Newmaker was on his feet when he was shot), and their later statements

28   (that Newmaker was on the ground when he was shot).  The video shows that Newmaker

1    was up, then down, then up, then down – all within a matter of a few seconds.  Given the

2    rapidity with which the events were unfolding, it is understandable that the officers might

3    have modified their recall upon further consideration.

4       In a related argument, plaintiff contends that the trajectory of the bullets, as shown in

5    the autopsy report, indicates that Newmaker was on the ground when he was shot.

6    However, the evidence of the bullet trajectory is also consistent with his having been shot

7    while leaning over in a forward direction, as defendants have noted.  At a minimum, the

8    video shows that this was not a case where a suspect was lying passively on the ground,

9    and was shot in the back as he lay there.  The video shows that Newmaker was constantly

10    in motion, was actively and violently engaged in resisting the officers, and at some point

11    managed to get his hands on a potentially dangerous weapon which the officers testified he

12    attempted to use against Ellebrecht.     The court finds that the testimony of the officers is

13    not inconsistent with the video evidence.

14                                **CONCLUSION**

15       In accordance with the foregoing, the claims asserted against defendant Sgt.

16    Charles Ellebrecht are DISMISSED; the <u>Monell</u> claims asserted against defendant City of

17    Fortuna are DISMISSED; the federal claims based on unreasonable detention, false arrest,

18    and denial of medical care are DISMISSED as to defendant Officer Maxwell Soeth; and

19    defendants' motion for summary judgment is GRANTED as to the remaining § 1983 claims

20    against defendant Officer Soeth, based on qualified immunity.

21       With regard to the state law claims, a district court may decline to exercise

22    supplemental jurisdiction over state law claims if it has "dismissed all claims over which it

23    has original jurisdiction."  28 U.S.C. § 1367(c).  The exercise of supplemental jurisdiction is

24    designed to promote "judicial economy, convenience, fairness, and comity[.]" <u>Carnegie-</u>

25    <u>Mellon University v. Cohill</u>, 484 U.S. 343, 350 (1988); <u>Oliver v. Ralphs Grocery Co.</u>, 654

26    F.3d 903, 911 (9th Cir. 2011).

27       However, when all federal claims have been dismissed, the interests promoted by

28    supplemental jurisdiction are no longer present, and a court may decline to exercise

jurisdiction over state-law claims. 28 U.S.C. § 1367(c); <u>Carnegie-Mellon</u>, 484 U.S. at 350 n.7 ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.")

Having granted summary judgment as to the remaining § 1983 claims, based on qualified immunity, and given California's interest in applying its own law in disputes between California residents, the court declines to exercise supplemental jurisdiction and DISMISSES the state-law claims without prejudice to their being pursued in state court.

**IT IS SO ORDERED.**

Dated:  December 23, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
For the Northern District of California

24